626 F.2d 896

AMERICAN OPTOMETRIC ASSOCIATION, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

AMERICAN MEDICAL ASSOCIATION, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

The STATE OF TEXAS, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent,

State of North Carolina, Commonwealth of Pennsylvania, Intervenors.

STATE OF OKLAHOMA ex rel. The BOARD OF EXAMINERS IN OPTOMETRY, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent,

State of North Carolina, Commonwealth of Pennsylvania, State of Tennessee, Intervenors.

STATE OF NEBRASKA, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent,

State of North Carolina, Commonwealth of Pennsylvania, State of Tennessee, Intervenors.

STATE OF INDIANA, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent,

State of North Carolina, Commonwealth of Pennsylvania, State of Tennessee, Intervenors.

The STATE OF WYOMING, Acting By and Through the WYOMING BOARD OF EXAMINERS IN OPTOMETRY, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

COMMONWEALTH OF KENTUCKY, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

Nos. 78–1461, 78–1514, 78–1687, 78–1693, 78–1695, 78–1696, 78–1841 and 78–1872.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1979.

Decided Feb. 6, 1980.

Edward A. Groobert, Washington, D. C., with whom Ellis Lyons, Bennett Boskey and Thomas S. Moore, Washington, D. C., were on brief, for petitioner in No. 78–1461.

Susan J. Dasher, Asst. Atty. Gen., State of Texas, Austin, Tex., with whom John L. Hill, Atty. Gen., and P. M. Schenkkan, Sp. Asst. Atty. Gen., State of Texas, Austin, Tex., were on brief, for petitioner in No. 78–1687.

H. Lee Schmidt, Asst. Atty. Gen., State of Oklahoma, Oklahoma City, Okl., was on brief, for petitioners in No. 78–1693.

Paul Douglas, Atty. Gen., and Melvin K. Kammerlohr, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., were on brief, for petitioner in Nos. 78–1695 and 78–1696.

Donald B. Bogard, Indianapolis, Ind., Chief Counsel for the Atty. Gen., State of Indiana, was on brief, for petitioner in No. 78–1696.

Michael H. Schilling, Asst. Atty. Gen., State of Wyoming, Cheyenne, Wyo., was on brief, for petitioner in No. 78–1841.

Mark F. Armstrong, Asst. Atty. Gen., State of Kentucky, Frankfort, Ky., was on brief, for petitioner in No. 78–1872.

Newton N. Minow, Chicago, Ill., with whom Jack R. Bierig, Chicago, Ill. and Lee M. Mitchell, Washington, D. C., were on brief, for petitioner in No. 78–1514.

Terry S. Latanich, Atty., F. T. C., Washington, D. C., with whom Michael N. Sohn, Gen. Counsel, David M. Fitzgerald and Jane

P. Schlaifer, Attys., F. T. C., Washington, D. C., were on brief, for respondents.

Rufus L. Edmisten, Atty. Gen., David S. Crump and Howard A. Kramer, Asst. Attys. Gen., Raleigh, N. C., were on brief, for intervenor, State of North Carolina, in Nos. 78–1687, 78–1693, 78–1695 and 78–1696.

John L. Shearburn, Deputy Atty. Gen., State of Pennsylvania, Harrisburg, Pa., was on brief, for intervenor in Nos. 78–1687, 78–1693, 78–1695, 78–1696.

William M. Barrick, Asst. Atty. Gen., State of Tennessee, Nashville, Tenn., was on brief, for intervenor in Nos. 78–1692, 78–1695, 78–1696.

Thomas L. Boeder, Senior Asst. Atty. Gen., State of Washington, Seattle, Wash., was on brief, for State of Washington, amicus curiae urging the Court to set aside and void the Federal Trade Commission ruling in No. 78–1461.

Donald O. Meserve and Paul E. Sherman, Albany, N. Y., were on brief, for amicus curiae, the Board of Regents of the State of New York, urging the Court to declare 16 C.F.R. Part 456 void and in excess of the Federal Trade Commission's statutory authority in Nos. 78–1461, 78–1514, 78–1687, 78–1693, 78–1695, 78–1696, 78–1841 and 78–1872.

Donald S. Dawson and M. Joseph Stoutenburgh, Washington, D. C., were on brief, for Opticians Association of America, amicus curiae urging the denial of petition in Nos. 78–1461, 78–1514, 78–1687, 78–1693, 78–1685, 78–1696, 78–1841 and 78–1872.

Alan G. Perkins, Sacramento, Cal., was on brief, for California Optometric Association, amicus curiae urging the Court to set aside and vacate the Federal Trade Commission ruling in No. 78–1461.

Robert B. Gillan, Los Angeles, Cal., was on brief, for California Commission on Aging, Mountain Plains Congress of Senior Organizations and Gray Panthers, amicus curiae urging affirmance in No. 78–1461.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The states of Colorado, Mississippi, North Dakota, Maine, South Dakota, and Vermont,

Before McGOWAN and WALD, Circuit Judges, and PENN,* District Judge, United States District Court for the District of Columbia.

Opinion for the court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Pursuant to its authority under the Magnuson-Moss Act, the Federal Trade Commission has issued a rule which dramatically curtails the ability of states and professional associations to restrict or burden the advertising of eye examinations or of ophthalmic goods and services. The Act provides that interested persons may secure judicial review of such a rule from this court by filing a petition within sixty days after the rule is promulgated. 15 U.S.C. § 57a(e)(1)(A). The American Optometric Association, the American Medical Association, and the states of Indiana, Nebraska, Texas, Oklahoma, Wyoming, North Carolina, Kentucky, Tennessee, and Pennsylvania have filed timely petitions or have become intervenors.[1]

Because we conclude that the Supreme Court's decision in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 has worked changes which, after the rule was promulgated, altered the very nature of the case, we remand all but one of the sections of the rule for further consideration by the Commission.

## I

### The Statutory Framework

On January 4, 1975, the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act became law. Title I of that Act, with which we are here only peripherally concerned, sets detailed and extensive standards for warranties and for remedies for breach of warranty. Title II, which is

and the Board of Regents of the University of the State of New York have joined as *amici* in the brief filed by the states.

the basis for the rule contested here, was enacted to "codify the Commission's authority to make substantive rules for unfair or deceptive acts or practices in or affecting commerce." S.Rep.No.93–1408, 93rd Cong., 2d Sess. 31 (1974), U.S.Code Cong. & Admin.News 1974 pp. 7702, 7763. That rule-making authority is granted and defined at 15 U.S.C. § 57a (1976) as follows:

(a)(1) The Commission may prescribe—

(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), and

(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title). Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

(2) The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title.) The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.

The statute describes with some care the rule-making procedures which are to be used. They are essentially an elaboration of the informal rule-making procedures embodied in section 553 of the Administrative Procedure Act:

(b) When prescribing a rule under subsection (a)(1)(B) of this section, the Commission shall proceed in accordance with section 553 of title 5 (without regard to any reference in such section to sections 556 and 557 of such title), and shall also (1) publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule; (2) allow interest-ed persons to submit written data, views, and arguments, and make all such submissions publicly available; (3) provide an opportunity for an informal hearing in accordance with subsection (c) of this section; and (4) promulgate, if appropriate, a final rule based on the matter in the rulemaking record (as defined in subsection (e)(1)(B) of this section), together with a statement of basis and purpose. 15 U.S.C. § 57a(b) (1976).

In conducting these informal hearings, the Commission is instructed to permit interested persons not only to present oral and written evidence, but, where appropriate in resolving disputed issues of material fact, to allow such persons to present rebuttal submissions and conduct cross-examinations. 15 U.S.C. § 57a(c) (1976).

*The Rule Making*

On September 16, 1975, the Commission instructed its staff to inquire "into the adequacy of information disclosure in the retail ophthalmic market." Federal Trade Commission (Bureau of Consumer Protection), Staff Report on Advertising of Ophthalmic Goods and Services and Proposed Trade Regulation Rule 16 C.F.R. Part 456 at 1 (1977) [hereinafter Staff Report]. On January 16, 1976, after the staff had conducted research and surveyed the opinions of interested parties, the Commission, pursuant to its authority under the Magnuson-Moss Act, proposed a trade regulation rule. Then, over approximately four months, more than one hundred comments were received. These were supplemented with thirty-two days of hearings in five cities. After another comment period, the presiding officer for the proposed rule and the Commission's staff submitted analyses of the rulemaking record. A third comment period was followed by an opportunity for consumer and industry groups to address the Commissioners themselves.

From these investigations, the Commission concluded that, because state laws and the by-laws of state and national associations of optometrists and ophthalmologists have prohibited or restricted advertising of

eye examinations and ophthalmic goods and services, (1) consumers are poorly informed about eye examinations and ophthalmic goods and services and (2) the prices of those goods, services, and examinations are artificially high. Consequently, on June 2, 1978, the Commission promulgated the rule we are now asked to review. The Commission intends that, under this rule, there be virtually no restrictions on advertising of ophthalmic goods and services and few restrictions on advertising of eye examinations.

As 5 U.S.C. § 57a(b)(4) (1976) requires, the Commission explained the reasons for the rule in a statement of basis and purpose which accompanied the rule's promulgation. 43 Fed.Reg. 23992 (1978). The statement's findings and conclusions may be summarized as follows.

The retail portion of the ophthalmic industry is made up of three kinds of professions. Ophthalmologists are licensed physicians who may diagnose and treat all conditions of the eye, may perform surgery, and may prescribe drugs and corrective lenses. They conducted 43 percent of the eye examinations and dispensed over 10 percent of the corrective lenses provided in the United States in 1975. Optometrists are licensed to perform eye examinations and to prescribe and adapt lenses. They are trained to detect, but may not definitely diagnose, diseases of the eye, and they may neither perform surgery nor prescribe drugs. They conducted 57 percent of the eye examinations given and dispensed 49 percent of the corrective lenses sold in 1975. Finally, opticians dispense eye-glasses on the prescription of ophthalmologists and optometrists. Forty-one percent of the lenses retailed in 1975 were distributed by opticians.

The Commission concluded that there is little advertising of ophthalmic goods and services in the United States. As a practical matter, the Commission believed, ophthalmologists do not advertise even where they are permitted by law to do so; and, as a matter of law, optometrists and opticians were, as of May 1, 1977, under the following restrictions on advertising:

(1) In 19 states, No [sic] price advertising of eyeglasses is permitted, by virtue of the legal restraints pertaining to both optometrists and opticians;

(2) In 17 states, price advertising by opticians is permitted, but is prohibited for optometrists;

(3) In 2 states, price advertising by one practitioner group is prohibited, and by the other group is partially restricted;

(4) In 5 states, price advertising by both groups is partially restricted;

(5) In 2 states, price advertising by opticians is permitted, but by optometrists is partially restricted. . . .

*Id.* at 23994 (footnotes omitted). In the six states which impose no legal restrictions on price advertising, optometrists who are members of their state associations are forbidden by those organizations to advertise. *Id.*

The statement of basis and purpose refers us to the Staff Report's description of the attitudes toward advertising of the private associations of eye specialists. Ophthalmologists, of course, are doctors, and they may therefore belong to the American Medical Association (AMA). The Staff Report, which is dated May 20, 1977, quotes from the AMA's Principles of Medical Ethics (a physician "should not solicit patients") and states that the Opinions of the Judicial Council of the AMA "make clear that advertising is considered a form of solicitation, which is clearly condemned as an affront to the dignity and honor of the profession." Staff Report, *supra,* at 70. The Staff Report offers the following (undated) excerpt from an Opinion which, the Staff Report says, "exemplifies the Association's views on advertising as it relates to professionalism."

The refraining from or the employment of advertising is the clearly defined difference between a reputable physician and a quack—the physician, one who quietly, through his professional work and attainments seeks by daily honorable dealing to spread the truth among his patients, the quack, one who endeavors to obtain his livelihood by playing on the

credulity of the ignorant and timid, imposing on the public statements known to be false, stopping at nothing in his effort to enhance his notoriety or fill his pocket. *Quoted id.* The Staff Report comments: "The advertising of prices or fees is not specifically mentioned in the Principles or the Opinions—apparently either because such advertising is implicitly banned in the proscriptions regarding solicitation, or because the hoary medical tradition against advertising is so universally adhered to that the AMA tribunal was never called upon to rule on the issue." *Id.* at 71.

One-third of the ophthalmologists in the country are members of the American Association of Ophthalmology (AAO). The Staff Report cites the AAO's response in 1962 to proposed FTC Trade Practice Rules for the Optical Products Industry, in which response the AAO (then called the National Medical Foundation for Eye Care) opposed advertising of ophthalmic services and of contact lenses. *Id.* at 69–70.

As to the American Optometric Association (AOA), to which fifteen of the twenty thousand American optometrists belong, the Staff Report relates that, under the urging of the FTC, the AOA has moderated its earlier national policy against advertising and now defers to the standards for advertising set by the various state associations. However, says the Staff Report: "That the Association still manifestly opposes price advertising is evident in its role in this proceeding as the leading exponent of interested parties opposed to the proposed rule, in the testimony of its president, and in the written comments of the organization." *Id.* at 73 (footnotes omitted). The Staff Report's survey of state optometric associations suggests that those associations attempt to limit or prevent advertising through codes of ethics and restrictions on membership.

The Opticians Association of America (OAA) reported to the Commission that it has no policy against advertising, and the Staff Report states that "organized opticianry as a whole has officially neither condemned or condoned it." *Id.* at 77.

The Commission's statement of basis and purpose surveyed the pricing structure of the industry and found that the failure to advertise imposes "costs" on consumers. The first of these costs may be inferred from evidence which "indicated that a wide range of prices existed within many jurisdictions for comparable prescription eyewear." 43 Fed.Reg. 23992, 23994 (1978). The Commission cites surveys which argue that "prices for lenses, frames, or complete eyeglasses vary as much as 100 percent to 300 percent from seller to seller." *Id.* Since the absence of advertising makes it difficult for consumers to find out who provides ophthalmic goods and services most cheaply (or even to discover that prices vary dramatically), consumers often pay high prices unwittingly and unwillingly. While the Commission acknowledges that these studies generally do not prove that prices vary *because* many sellers of eyeglasses do not fully advertise their wares, the Commission contends that economic theory suggests there is such a relationship.

Prices not only *vary* where advertising is forbidden; the studies and the testimony of consumers and retail chains "tend to show that prices are lower in states that permit advertising." *Id.* at 23995. This accords with the standard economic theory that

[p]rice advertising serves to reduce mean prices by informing the public of price alternatives (so that a greater percentage of the public will purchase from sellers who offer lower prices) and by inducing greater price competition among sellers (resulting either in reduced prices or deterrence of future price increases).

*Id.*

Higher prices are not the only "cost" of restrictions on advertising—such restrictions also increase "consumer search costs." That is, "[b]y providing the consumer information concerning products, price and performance characteristics, advertising helps the consumer to assess product differences and make a rational purchase decision." *Id.* But when merchants do not advertise, the consumer must spend time and trouble learning enough to purchase wisely. Fur-

ther, consumer ignorance has meant that people, especially the poor and the aged, do not know when they need eye care or how to go about obtaining it.

*The Rule*

The Commission reasoned that, if the problem is that vendors of ophthalmic goods and services do not advertise, the solution is to prohibit restrictions or burdens on their advertising. The heart of the rule's attempt to do so is contained in sections 456.2 through 456.6. The first of these sections makes it an unfair act or practice for sellers "to fail to disseminate information concerning ophthalmic goods and services notwithstanding state or local law to the contrary" and for refractionists "to fail to disseminate information concerning eye examinations," again notwithstanding contrary state or local law. However, any seller or refractionist acting alone who fails to disseminate such information has not committed an unfair act or practice. Thus, this rule does not affect the individual decision of an individual seller or refractionist not to advertise, and § 456.9(d) specifically disclaims any "intent to compel any seller or refractionist to disseminate information by virtue of this part."

Section 456.3 makes it an unfair act or practice for a state or local entity to enforce any:

(a) Prohibition, limitation or burden on the dissemination of information concerning ophthalmic goods and services by any seller or group of sellers; or

(b) Prohibition, limitation or burden on the dissemination of information concerning eye examinations by any refractionist.

*Provided*: Nothing in subparagraph (b) shall be construed to prohibit the enforcement of a state or local law which permits the dissemination of information concerning eye examinations, including information on the cost and availability of those examinations, but requires that specified affirmative disclosures also be included.

Some confusion has occurred in the discussion of this case because of the natural but mistaken assumption that an eye examination is an ophthalmic service. Section 456.1 defines ophthalmic services as "the measuring, fitting, and adjusting of ophthalmic goods [eyeglasses or contact lenses] to the face subsequent to an eye examination." Thus the term "ophthalmic services" does not include an eye examination, which is "the process of determining the refractive condition of a person's eyes or the presence of any visual anomaly by the use of objective or subjective tests." The importance of this distinction lies in the fact that, while the rule generally forbids a state to require an advertiser to include affirmative disclosures in his advertisements, it specifically permits such a requirement for advertising of eye examinations.

Section 456.4 makes it an unfair act or practice for a seller or refractionist "to reduce, limit, or burden the dissemination of information" in compliance with the laws described in section 456.3, again with the proviso as to affirmative disclosures in advertising for eye examinations.

Section 456.5 addresses further the matter of "affirmative disclosures." Though a state's requirement that advertising include such disclosures is, under the rule, ordinarily an impermissible burden on advertising, subparagraph (a) of section 456.5 specifically allows states to require that advertisements for ophthalmic goods and services include the following information:

(1) Whether an advertised price includes single vision and/or multifocal lenses;

(2) Whether an advertised price for contact lenses refers to soft and/or hard contact lenses;

(3) Whether an advertised price for ophthalmic goods includes an eye examination;

(4) Whether an advertised price for ophthalmic goods includes all dispensing fees; and

(5) Whether an advertised price for eyeglasses includes both frames and lenses.

Subparagraph (b) makes a further exception to the prohibition of laws requiring

disclosures. This exception is for laws which are of general applicability:

> Where a state or local law, rule or regulation applies to all retail advertisements of consumer goods and services (including a law, rule, or regulation which requires the affirmative disclosure of information or imposes reasonable time, place and manner restrictions), such a law, rule, or regulation shall not be considered to prohibit, limit, or burden the dissemination of information.

Finally, subparagraph (c) of section 456.5 provides that states may apply to the Commission for permission to require other disclosures.

The last of these sections—section 456.6—is aimed at private restraints on eye-care advertising. It reads:

> (a) It is an unfair act or practice for any person, other than a state or political subdivision or agency thereof, to prohibit, limit or burden:
>
> (1) The dissemination of information concerning ophthalmic goods and services by any seller;
>
> (2) The dissemination of information concerning eye examinations by any refractionist. *Provided:* Nothing in this subpart shall be construed to prohibit any person from imposing reasonable affirmative disclosure requirements on the dissemination of information concerning eye examinations.
>
> (b) Any organization or association which is not composed primarily of sellers and/or refractionists, which adopts or enforces self-regulatory guidelines for the dissemination of information which apply to all retail advertisements of consumer goods and services, shall not be deemed to be in violation of this subpart.
>
> (c) The conditioning of membership in a professional or trade association of sellers or refractionists on a requirement that members or prospective members of that association not engage in the dissemination of information concerning ophthalmic goods and services and eye examinations or a requirement that ophthalmic goods and services be adver-

tised only in a prescribed manner shall be deemed to prohibit, limit or burden the dissemination of that information.

Each of the sections we have discussed except section 456.6 limits or abolishes the authority of a state to regulate the advertising of ophthalmic goods and services and of eye examinations. In section 456.9, the Commission expressly declared its intention that this rule pre-empt state law:

> (a)(2) It is the intent of the Commission that this part shall preempt all state and local laws, rules, or regulations that are repugnant to this part, and that would in any way prevent or burden the dissemination of information by retail sellers of ophthalmic goods and services to prospective purchasers, except to the extent specifically permitted by this part. All state or local laws, rules, or regulations which burden the dissemination of information by requiring affirmative disclosures specifically addressed to ophthalmic goods and services are preempted, except for those specifically permitted by this part. State and local laws, rules, or regulations which apply to advertising of all consumer goods and services, including those that require affirmative disclosure of information, are not preempted.
>
> (b) It is the Commission's intent that state laws which do not permit refractionists to disseminate information concerning eye examinations, including information concerning the cost and availability of those examinations, be preempted. State and local laws, rules or regulations which require affirmative disclosure of information in all disseminations of information concerning eye examinations are not preempted.

One way of understanding the rule is to ask what regulations states *may* impose on eye-care advertising. First, states may continue to enforce regulations of advertising which apply to advertising of *all* consumer goods and services. Second, they may continue to impose affirmative disclosures in advertising of eye examinations. Third, they may continue to require the five listed

affirmative disclosures in advertising of ophthalmic goods and services. Except with the permission of the Federal Trade Commission, they may do no more.

Similarly, private associations *may* attempt to regulate eye-care advertising in the following ways. First, associations not composed primarily of sellers of ophthalmic goods and services or of refractionists may adopt or enforce self-regulatory guidelines which apply to the advertising of *all* retail advertisements of consumer goods and services. Second, associations may impose affirmative disclosure requirements in advertising of eye examinations.

## II

### *The Scope of Judicial Review*

5 U.S.C. § 57a(e)(3) (1976) describes the scope of the review to be applied by a court considering a rule pursuant to a petition filed by an interested person within sixty days after the rule was promulgated. *See* 15 U.S.C. § 57a(e)(1)(A) (1976). Such a court

shall hold unlawful and set aside the rule on any ground specified in subparagraphs (A), (B), (C), or (D) of section 706(2) of title 5 (taking due account of the rule of prejudicial error), or if—

(A) the court finds that the Commission's action is not supported by substantial evidence in the rulemaking record (as defined in paragraph (1)(B) of this subsection) taken as a whole . . .

Section 706(2) requires a reviewing court to

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .[2]

**2.** The rest of § 706(2) requires the court to set aside actions it finds

(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law . . . .

However, the legislative history of the Magnuson-Moss Act reveals that Congress envisioned a somewhat unusual relationship between the arbitrary-or-capricious standard and the substantial-evidence standard for the review of rules promulgated under that Act. The substantial-evidence standard is to be applied only to the Commission's "factual determinations." 120 Cong.Rec. 40725 (1974) (statement of Sen. Moss). The arbitrary-or-capricious standard is to be applied to all other determinations: "Conclusions arising from those factual determinations would be reviewed as is normal: Do the facts supported by substantial evidence support the conclusions on the basis of logic." *Id.* The legislative history also phrases the distinction in terms of "adjudicative" and "legislative" facts. For example, the Conference Report explained that

the court would set aside a rule under section 18 if it found that the findings and conclusions of the Commission with regard to disputed issues of material fact on which the rule is based are not supported by substantial evidence in the rulemaking record taken as a whole. Of course, this test would not apply to findings or determinations of legislative fact.

H.R.Rep. No. 93–1606, 93d Cong., 2d Sess. 34 (1974).

A brief examination of the reasons Congress was specially concerned that courts carefully review findings of fact confirms the conclusion that "factual determinations" are to be reviewed under the substantial-evidence standard, commonly considered the stricter of the two standards. By the time the Magnuson-Moss Act was passed, this court had already held that the

Also part of § 706(2), but not incorporated in the Magnuson-Moss Act, are the following criteria:

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

Commission has rule-making powers. *National Petroleum Refiners Association v. Federal Trade Commission*, 157 U.S.App. D.C. 83, 482 F.2d 672 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). However, Congress wished to put that power on a statutory basis because the rule-making procedures the Commission was required to follow were only those of section 553 of the Administrative Procedure Act, and the standard for judicial review only that of section 706(2)(A)–(D) of that Act. As the House Committee considering the Magnuson-Moss Act wrote:

> Your committee believes these rule-making procedures and this scope of judicial review may be inadequate in some cases where fundamental *factual* premises of a rule are at issue. Because of the potentially pervasive and deep effect of rules defining what constitutes unfair or deceptive acts or practices and the broad standards which are set by the words "unfair or deceptive acts or practices", the committee believes greater procedural safeguards are necessary. Accordingly, it has fashioned the rulemaking procedures and judicial review provisions described below which we believe to be more appropriate in this context than merely relying upon the provisions of sections 553 and 706 of title 5.

H.R.Rep. No. 93–1107, 93d Cong., 2d Sess. 45–46 (1974), U.S.Code Cong. & Admin. News 1974, pp. 7702, 7715 (emphasis added). Congress's particular concern for the accuracy of fact-finding is emphasized by the Act's detailed provision for an informal hearing procedure which includes cross-examination and rebuttal submissions, 15 U.S.C. § 57a(c) (1976), and for judicial review of any Commission decision concerning cross-examination and rebuttal submissions which might have "precluded disclosure of disputed material facts which was necessary for fair determination by the Commis-

sion of the rulemaking proceeding taken as a whole." 15 U.S.C. § 57a(e)(3)(B).

We must also resolve a second issue related to the proper scope of judicial review under the Magnuson-Moss Act. It will be recalled that review of a rule under that Act is to be "in accordance with chapter 7 of title 5." 15 U.S.C. § 57a(e)(3). Section 706 of that title states that "the court shall review the whole record or those parts of it cited by a party . . . ." The Magnuson-Moss Act defines the rulemaking record as "the rule, *its statement of basis and purpose*, the transcript required by subsection (c)(4) of this section, any written submissions, and any other information which the Commission considers relevant to such rule." 15 U.S.C. § 57a(e)(1)(B) (emphasis added). However, section 57a(e)(5)(C) provides that "[t]he contents and adequacy of any statement required by subsection (b)(4) of this section shall not be subject to judicial review in any respect." And, the "statement required by subsection (b)(4)" is the rule's statement of basis and purpose. In short, (1) we must review the whole record, (2) the record is explicitly defined to include the statement of basis and purpose, yet (3) we are explicitly forbidden to review the statement of basis and purpose "in any respect."[3]

This conflict is particularly troubling because, in order to decide whether an agency's action is arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 824, 28 L.Ed.2d 136 (1971). The statement of basis and purpose, as the only exposition of its reasoning the Commission itself issues, is where a court must look in order to identify the factors on which the Commission's decision was based. Indeed, the whole discussion in the Act's

---

**3.** It might be thought that the "whole record" requirement of section 706 had simply been overlooked by the drafters of the Magnuson-Moss Act. However, in discussing the application of the substantial-evidence standard of review, the Act requires the court to hold a rule unlawful if "the Commission's action is not supported by substantial evidence in the rulemaking record (as defined in paragraph (1)(B) of this subsection) taken as a whole . . . ." 15 U.S.C.A. 57a(e)(3)(A) (1976).

legislative history of the different standards of review of "legislative" and "adjudicative" facts would be pointless if the court could not consult some statement in which the Commission described the various facts on which it relied in writing the rule. As this court said in *Automotive Parts & Accessories Ass'n v. Boyd,*

> We do expect that, if the judicial review which Congress has thought it important to provide is to be meaningful, the "concise general statement of * * * basis and purpose" mandated by Section 4 will enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.

132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968).

The authors of the committee reports which make up the legislative history of the Magnuson-Moss Act seem not to have noticed that the provisions respecting review of a rule's statement of basis and purpose are mutually contradictory. Rather, the Conference Committee Report states, "Although such a statement must accompany promulgation of a rule, its contents are not to be subject to court review on any basis at any time." H.R.Rep. No. 93–1606, 93d Cong., 2d Sess. 32 (1974). Insofar as this prohibition is explained in the legislative record, we are told that the statement is to be a concise means of reporting to Congress how the powers it has delegated to the Commission are being used and of specifying to the general public the requirements the rule makes of it. *Id.*

A clue as to the purpose of thus limiting judicial review may be found in the report of the House Committee considering the bill:

> The statement is not intended to be a summary of all the legal findings which might be necessary to support the rule. In particular, the requirement that the statement include statements as to the economic impact of the rule does not require the Commission to undertake a full

scale economic investigation prior to promulgation of the rule. To do this would inordinately delay FTC proceedings and deny relief to the consuming public while indefinite questions of economic prediction were resolved by the Commission. This provision should be read to require that the Commission consider the economic impact of the rule to issues and summarize its best estimate of that impact in the statement.

H.R.Rep. No. 93–1107, 93d Cong., 2d Sess. 47 (1974) U.S.Code Cong. & Admin.News 1974, p. 7729.

█ The gist of Congress' concern, then, seems to be that courts not require that the statement be such a "voluminous or detailed document," H.R.Rep. No. 93–1606, 93d Cong., 2d Sess. 32 (1974), that it would require the Commission to undertake an unreasonably detailed study of the need for or consequences of a rule or to account in unreasonable detail for its conclusions. We will therefore seek to resolve the conflicting commands of the statute by consulting the statement of basis and purpose where the statement is helpful in understanding the Commission's reasoning, but, nevertheless, being careful not to impose upon the statement the unreasonable demands about which Congress was concerned.[4]

### III

*Changes in the Circumstances Underlying the Rule*

Courts are properly reluctant to base a remand of an agency's decision on the ground that the decision relies on evidence which has grown stale while the decision awaits judicial review. As the Supreme Court has said of adjudicative proceedings,

> One of the grounds of resistance to administrative orders throughout federal experience with the administrative process has been the claims of private litigants to be entitled to rehearings to bring the record up to date and meanwhile to stall the enforcement of the ad-

---

4. We note that, in its brief, the Commission itself cites the statement of basis and purpose

so frequently that its "Table of Authorities" relates that those citations appear "passim."

ministrative order. Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

*I.C.C. v. New Jersey*, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944).

The Commission's rule has now been in the making for over four years, and a good deal of time, energy, and thought, public and private, has been spent upon it. Furthermore, if the rule is as much needed as the Commission believes, the costs to consumers of delaying its enforcement would not be insignificant. We are therefore sensitive to the argument that we should determine the rule's legality as promptly as possible.

■ Nevertheless, there are occasionally times in which the equities of a situation militate in favor of returning a rule to an agency for further consideration in light of new evidence. Thus, this court has said that our decisions "reflect a doctrine favoring remand, in the interest of a just result, where there has been a change in circumstances, subsequent to administrative decision and prior to court decision, that is not merely 'material' but rises to the level of a change in 'core' circumstances, the kind of change that goes to the very heart of the case." *Greater Boston Television Corp. v. FCC*, 149 U.S.App.D.C. 322, 337, 463 F.2d 268, 283 (1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). We hold that the changes in state law which fol-

lowed the Supreme Court's decision in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and which have continued since the FTC promulgated this rule constitute such a change in circumstances. As we explain in this section of our opinion, (1) basic information on which the Commission relied has changed, (2) those changes have created circumstances sufficiently different that, on reconsideration, the Commission might wish to write different rules, and (3) since those different rules might well necessitate different judicial responses than the rule before us would evoke, remand is not a pointless formality.

A

When rule-making in this case began on September 16, 1975, there was little reason to believe that legal restrictions on the advertising of ophthalmic goods and services were unconstitutional or that they would be ended in the foreseeable future. However, on May 24, 1976, after the Commission first proposed the rule, the Supreme Court decided *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346. That decision held violative of the First Amendment a Virginia statute which provided: "Any pharmacist shall be considered guilty of unprofessional conduct who . . . publishes, advertises or promotes, directly or indirectly, in any manner whatsoever, any amount, price, fee, premium, discount, rebate or credit terms for professional services or for drugs containing narcotics or for any drugs which may be dispensed only by prescription." Va.Code Ann. § 54–524.35 (1974), *quoted in Virginia Pharmacy, supra*, 425 U.S. at 750 n.2, 96 S.Ct. at 1819 n.2. (A pharmacist found to have committed unprofessional conduct was subject to a civil monetary penalty, or to revocation or suspension of his license.) After the Court handed down its decision in *Virginia Pharmacy*, the FTC's Presiding Officer in this rule-making acknowledged the relevance of the case for this rule by announcing that rebuttal submissions could include comments on any

consequences that case ought to have for the proposed rule.

Later in his report, the Presiding Officer explained in some detail that

> *Virginia Pharmacy* does not supplant the need for the rule. Furthermore there is no justification for either a termination of the proceeding or a delay for the purpose of ascertaining what action the states might take to eliminate restraints on the dissemination of information pertaining to the cost and availability of ophthalmic goods and services.

*Presiding Officer's Report* at 177. The core of his justification for this proposition was his speculation that "[e]fforts to distinguish the ophthalmic field from the prescription drug field may be successful and may cause other courts, including the Supreme Court, to reach a different conclusion with respect to ophthalmic advertising." *Id.* at 173. The Presiding Officer pointed especially to the possibility that the reach of *Virginia Pharmacy* might not be extended from the advertising of goods to the advertising of professional services. He concluded his argument on this problem by saying: "Certainly it would be difficult for the Court to address the case of ophthalmologists and optometrists without also considering that of the legal and medical professions generally." *Id.* at 175.[5]

On June 27, 1977, the Supreme Court decided *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810. There, the Court answered the question which the Presiding Officer had apparently regarded as unsettled and crucial, for in *Bates* the Court extended the First Amendment's protection to include a lawyer's right to advertise the prices of routine services. The Court began its First Amendment analysis by invoking its decision in *Virginia Pharmacy.* The Court reminded its readers of the strength of the consumer's interest in the free flow of commercial speech, speech which "serves to inform the public of the availability, nature, and prices of products

and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system." 433 U.S. at 364, 97 S.Ct. at 2699. The Court reiterated its condemnation of the "highly paternalistic" approach which seeks to benefit citizens by keeping them ignorant. There is a "potent alternative" to that approach: " 'That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.' " 433 U.S. at 365, 97 S.Ct. at 2699, *quoting Virginia Pharmacy, supra,* 425 U.S. at 770, 96 S.Ct. at 1829. The Court set out this summary of the opinion in *Virginia Pharmacy,* it said, because the conclusion that the right to advertise the prices of routine legal services is protected by "the First Amendment might be said to flow *a fortiori* from it." 433 U.S. at 365, 97 S.Ct. at 2700. In sum, the Court analyzed the effects of state restrictions on advertising in much the same way as the Commission does, although the Court was at pains to say that false, deceptive, or misleading advertising may be restrained, and that, because the public is not sophisticated about legal services, "misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising." 433 U.S. at 383, 97 S.Ct. at 2709.

### B

In deciding whether to adopt this rule, the Commission relied upon evidence as to the nature of state laws as of May 1, 1977. Fed.Reg. 23992, 23994 (1978). However, *Bates* left little doubt that laws regulating the advertising of medical goods and services were susceptible to First Amendment scrutiny, and that total bans on such advertising could not survive such scrutiny. Primarily in response to *Bates,* a number of states have changed their laws regulating

---

**5.** The Presiding Officer also expressed his fear that *Virginia Pharmacy* might leave room for states to place some restrictions on the advertising of ophthalmic goods and services, even though such restrictions curtailed the freedom to advertise.

ophthalmic advertising. In its brief at 29, the Commission states without disagreement that the "AOA argues that in 14 states the legislatures have revised the preexisting laws, that in two states the attorneys general have issued opinions that total bans are unconstitutional, and that six state bans have been overturned in litigation."

In sum, the Supreme Court has incorporated into constitutional analysis those understandings about the role of advertising which the Commission made the basis of its rule. The Court has declared illegal the flat bans on advertising which the rule would prohibit. The Court has probably made illegal state laws which "burden" or "limit" advertising, just as the rule would. And a number of states have changed their laws in the direction the rule would require. The inevitable questions is whether the rule is any longer necessary. Our doubts about the proper answer to that question are confirmed by the fact that, as this section of the opinion illustrates, the Commission's staff and officials shared our doubts throughout the period the rule was being written.

The Presiding Officer's Report, we have seen, was prepared before *Bates* was decided. He considered with some care the implications of *Virginia Pharmacy,* only to conclude that the scope of its holding was too narrow to include the advertising of ophthalmic goods and services.

The Staff Report, of course, did not discuss *Bates* at all, since *Bates* was filed after the Report was written. However, the Report did acknowledge the possibility that "the *Virginia Pharmacy* precedent might obviate the need for Commission action." Staff Report at 61. Despite that possibility, the staff said that it agreed with the Presiding Officer's conclusion "that the full impact of *Virginia Pharmacy* remains to be determined," *id.* at 62, and it recommended that the case not "deter" the Commission from adopting the rule. The staff finished its discussion of *Virginia Pharmacy* with this sentence: "The need for the recommended Rule, and particularly the provi-

sions relating to the release of prescriptions, exists independently of *Virginia Pharmacy.*" *Id.* The Report did not explain further why the rule, especially that bulk of the rule *not* concerning the release of prescriptions, has this independent existence.

When the Acting Director of the Commission's Bureau of Consumer Protection transmitted the Staff Report to the Commission, she endorsed only the staff's recommendations as to private restraints and the release of prescriptions. She declined to support the disclosure regulations, in significant part because of "the Supreme Court's recognition of a First Amendment interest in access to truthful commercial information." Memorandum of May 20, 1977. She finished her discussion by saying: "It is my recommendation that the Commission act at this time only to eliminate explicit bans on advertising and that it reserve a decision on the effect of state disclosure requirements until it has the opportunity to observe state response to the rule." *Id.*

When the Director of the Bureau of Consumer Protection made his final recommendation on the rule, *Bates* had been decided. The Director thus noted that, "[i]f the Commission's rule were directed only to *total bans* by the states on advertising, it would do little or nothing more than the Supreme Court has already accomplished." Memorandum of November 25, 1977, at 6 (J.A. 125) (emphasis original). However, the Director supported the staff's recommendation that state affirmative disclosures be restricted on the grounds that a "substantial number of states have enacted disclosure requirements that are so demanding or so vague that, whatever their intent, they have the effect of discouraging ophthalmic advertising." *Id.* In commenting on proposed regulations for advertising of eye examinations and refractions, the Director wrote:

I believe that an affirmative declaration of Commission policy to ensure that *Bates* is implemented would have a significant impact on state regulation. However, I might also believe that we

have some obligation to attempt to flesh out the parameters of *Bates* before preempting state restrictions. The appropriate forum for such an exercise is a rulemaking proceeding.

*Id.* at 10 (J.A. 129).

In its statement of basis and purpose, the Commission itself dealt with *Virginia Pharmacy* and *Bates* in the following dismissive paragraph.

> Although the landmark Supreme Court decisions in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council* and *Bates v. State Bar of Arizona* have established some measure of first amendment protection for commercial speech, they have not addressed many issues raised by this rule, such as the extent to which affirmative disclosure requirements may hinder or facilitate the flow of truthful information to consumers. In fact, the rule complements these decisions by helping to insure that their objectives are carried out.

43 Fed.Reg. 23992, 23994 (1978) (footnotes deleted).

### C

We remand this rule not simply because it now duplicates state law in significant respects. We remand it because, as a number of the Commission's officials perceived, the diminished need for the rule intensifies questions which go "to the very heart of the case" in at least two areas.

The first such area results from the fact that the Commission's proposed pre-emption of state law is almost as thorough as human ingenuity could make it. Consequently, the Commission has at least approached the outer boundaries of its authority and may have infringed on that deference to the states' exercise of their police powers dictated by the principles of federalism. The rule therefore raises several interrelated issues: Did Congress authorize the Commission to pre-empt state laws? If so, did the scope of the Commission's delegated power permit it to pre-empt state laws to the extent of pre-empting the whole field of ophthalmic advertising? Does the "state action" doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), forbid the agency to issue this rule? Has the Commission exceeded its jurisdiction in treating the states as persons under the Magnuson-Moss Act? The relevance of the changes which followed *Bates* is that answers to these questions may well depend in some measure on the extent to which a federal regulation gratuitously intrudes on the exercise of the police powers of the states.[6]

The second such area has to do with the adequacy of the evidence the Commission has adduced to support its rule. The Commission has amassed, and we have surveyed,[7] considerable evidence to show that a total ban on the advertising of ophthalmic goods and services adversely affects the quality of information available to the con-

---

**6.** We note that in *Katharine Gibbs School v. FTC,* 612 F.2d 658 (2nd Cir. 1979), the Second Circuit recently expressed its dissatisfaction with the pre-emption provision of a Commission rule promulgated under the Magnuson-Moss Act and entitled "Proprietary Vocational and Home Study Schools," 16 C.F.R. § 438 (1979). That provision read:

> This trade regulation rule preempts any provision of any state law, rule, or regulation which is inconsistent with or otherwise frustrates the purpose of the provisions of this trade regulation rule, except where the Commission has exempted such a state or local law, rule or regulation. If, upon, *[sic]* application of any appropriate state or local governmental agency, the Commission determines that the state statutory or regulatory provision affords greater protection to stu-

dents than the comparable provision of the Commission's rule then the state requirement will be applicable to the extent specified in the Commission's determination on the exemption application.

16 C.F.R. § 438.9 (1979). The court found that, in light of its conclusion that the Commission had failed to identify with sufficient specificity the acts or practices it deemed deceptive, "the breadth of the preemption provision is such that it places in issue an indefinite variety of state laws and regulations governing the contractual relations between vocational schools and their students." At 667. *But see* Judge Newman's dissent in that case.

**7.** *See* text at 35–38 of 200 U.S.App.D.C.; at 899–902 of 626 F.2d *supra.*

sumers of those goods and services and that it tends to cause the prices of those goods and services to rise. However, a total ban on advertising is precisely what *Bates* forbids, and none of the parties to this proceeding suggests that a total ban is any longer permissible.

In contrast, there is almost no evidence, only speculation, as to what have, since *Bates,* become the genuinely controversial aspects of the Commission's rule. We refer particularly to the prohibition of most affirmative disclosure requirements and of other regulations aimed specifically at advertising of ophthalmic goods and services.[8]

There is scant evidence to support the Commission's apparent conclusion that states will, if permitted, abuse the power to require affirmative disclosures in ophthalmic advertising and to write "time, place, and manner" regulations specifically for ophthalmic advertising. As the Acting Director of the Bureau of Consumer Protection observed in transmitting the staff's report:

> Although state disclosure requirements could, if sufficiently costly and burdensome, effectively bar the advertising of ophthalmic goods and services, I believe

the record does not support a finding that a significant number of states have already taken such action or will do so in the future. Given the potential benefits to consumers of the elimination of advertising bans and the Supreme Court's recognition of a First Amendment interest in access to truthful commercial information, I do not think the Commission can accurately predict at this time the reaction of the states to the elimination of prohibitions on advertising. To the extent a prediction can be made, we should expect the states to comply with the Commission's rule.

Memorandum of May 20, 1977.

In discussing its concern that states will abuse the power to impose affirmative disclosures, the Commission directs our attention to Rule 3 of the Virginia State Board of Examiners in Optometry, which the Board adopted in response to *Virginia Pharmacy.* The FTC believes that "the validity of this concern was made starkly evident by an examination of disclosure regulations promulgated" by the Board. Brief at 63. What is stark to the Commission is less than plain to us. The Commission's staff found

---

**8.** Of course, the Commission argues that its remedial powers are sufficiently great to allow it to make regulations for which there is not direct evidence of need in order to prevent parties which have committed unfair acts and practices from doing so in the future. Nevertheless, even under the generous standards which the Commission would have us apply, the remedy must at least have a "reasonable relation to the unlawful practices found to exist." *Jacob Siegel Co. v. FTC,* 327 U.S. 608, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). *See, e. g., Chrysler Corp. v. FTC,* 182 U.S.App. D.C. 359, 366, 561 F.2d 357, 364 (1977). The Commission suggests that its discretion to formulate "appropriate means of providing the unfair practices found to exist is necessarily even greater in rulemaking . . ." than when it prescribes remedies in adjudications. Whether this is so we cannot now say. But in any event, the Commission does not and cannot contend that there are circumstances in which the "reasonable relationship" between the offense and the remedy need not exist.

The Committee further relies on 15 U.S.C. § 57a(a)(1)(B), which states that rules "may include requirements prescribed for the purpose of preventing such acts or practices."

While this language could certainly be read as granting the Commission authority to write broad prophylactic rules, the legislative history clearly states,

> This phrase was not intended to grant the Commission additional authority in the area of rulemaking but was added for the purpose of clarifying what was perhaps a technical deficiency in the House rulemaking provision. In an otherwise valid trade regulation rule the Commission may specify what must be done in order to avoid engaging in an unfair or deceptive practice.

S.Conf.Rep.No.93–1408, 93rd Cong., 2d Sess. 31 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7702, 7763. The example the Report uses to explain the above sentences indicates the limited nature of the authority the Congress is here delegating:

> For example, in the present Commission rule relating to "octane rating," the Commission required that certain testing procedures be followed in order to determine what octane rating should be posted on gasoline pumps. The conferees intend that the commission may continue to specify such matters in rules which are otherwise valid under Sec. 18.

there was no evidence that the Virginia statute had deterred anyone from advertising:

> In Virginia, even with the rigorous disclosure requirements, some price advertising, [*sic*] has occurred. Many of the beneficial attributes of advertising have been exhibited by these advertisements. Offers of multiple pairs of eyeglasses at reduced rates, offers of product guarantees, and vigorous price competition have occurred in the advertisements.

> Thus, staff cannot conclude, based on the available evidence, that even the most rigorous disclosure law enacted to date has resulted in substantial injury to consumers.

*Staff Report* at 226–27 (footnotes omitted). The staff nonetheless recommended the adoption of the proposed rules because, "[c]arried to the logical extreme, disclosure requirements could be used to effectively prevent all advertising." *Id.* at 228. Indeed, said the staff, "a number of witnesses testified to their belief that state boards of optometry would use disclosure requirements to prohibit indirectly all advertising." *Id.*[9] But it is precisely the fact that there is

by now considerable evidence as to the conduct of the states under *Bates* which makes it unnecessary for the Commission to rely on the speculations of a few witnesses.

The other state statutes to which the Commission refers require even fewer affirmative disclosures than the Virginia statute, and are presumably even less of a danger to consumers and those who would like to advertise ophthalmic goods and services. In addition, the Commission points to no evidence that any of these laws were passed with the intent of limiting advertising or that, if the laws were found burdensome, they would not be changed.

In view of the weakness of the evidence that states will abuse the power to impose affirmative disclosure requirements, the Commission's reasoning seems suspect. The rationale for the rule is that consumers need as much information as possible. For states to attempt (through disclosure requirements) to ensure that advertising actually serves that purpose seems to promote, not to thwart, that purpose.

Furthermore, we have been directed to little evidence in the record which would support the Commission's assumption that,

---

**9.** To support this statement, the staff, like the Commission in its brief, refers us to the testimony of the Chairman of the Board and the Chief Executive Officer of the Peoples Drug Store and to the testimony of the President of the South Carolina Association of Opticians. We note that on June 10, 1977, the South Carolina legislature made it "lawful for any licensed optician to advertise the price of eyeglasses" and prohibited "the use of any untruthful, impossible, improbable, or misleading statement." Calendar No. H. 2502, *quoted in* J.A. at 226. On July 1, 1978, the following bill became law:

Section 7. The 1976 Code is amended by adding:

"Section 40–37–81. Notwithstanding any other provision of law, the South Carolina Board of Examiners in Opticianry shall:

(1) Have no authority to makes [*sic*] rules, regulations or restrictions prohibiting the advertising on any media by opticians in connection with the supplying or price of eyeglasses except those prohibiting such by untruthful, misleading or similar means: *provided,* however, that notwithstanding the above provisions of this section, the board shall permit the price advertising in any media by opticians provided the following dis-

closures are components of each such advertisement:

(a) Whether an advertised price for eyeglasses includes single vision or multifocal lenses;

(b) Whether an advertised price for contact lenses refers to hard or soft contact lenses;

(c) Whether an advertised price for ophthalmic materials includes all dispensing fees;

(d) Whether an advertised price for ophthalmic materials includes an eye examination;

(e) Whether an advertised price for eyeglasses includes both frames and lenses

(2) Have no authority to make rules or regulations governing the employment of opticians, the location of optical stores, the number of optical stores operated, the advertising of optical products or services, or the manner in which such products can be displayed."

Calendar No. H. 3582, at pp. 4–5, *quoted in* J.A. at 225–26. The five affirmative disclosures this statute requires are, verbatim, the affirmative disclosures the Commission's rule would permit states to require.

except for the five factors listed in section 465.5, ophthalmic advertising ought to be regulated identically to any other kind of advertising. The Commission, in its statement of basis and purpose and in its brief, stresses that medical advertising involves issues of life and death. Given that special importance, and given the special lack of sophistication about medical advertising, cf. *Bates v. State Bar*, 433 U.S. at 383, 97 S.Ct. at 2708, it is not immediately apparent why special rules for medical advertising are inappropriate.

What the Commission is asking us to assume is that, despite the recent decisions of the Supreme Court, states will act against the interests of their citizens and in defiance of the dictates of the Constitution. The evidence for this assumption is that states have, in the past, had laws which made advertising of ophthalmic goods and services illegal, and that these laws are unconstitutional. However, the states had no way of knowing that these laws were unconstitutional until the day in 1977 when the Supreme Court handed down *Bates.* Conclusions about the states' bad faith from such evidence can hardly be well founded.

Simply put, what has happened is that, after the Commission wrote its rule and before we could review it, events so eroded the basis for it that it is no longer amenable to coherent judicial analysis. We therefore remand the rule for such reconsideration as the Commission, in the light of present circumstances, may see fit to give it.

### D

It is less readily apparent that section 456.6—which forbids private associations to burden the advertising of ophthalmic goods and services or most advertising of eye examinations—will be significantly affected by changes following the decision in *Bates.* Nevertheless, the possibility that such changes have occurred and will continue to occur is sufficiently great that we remand that section as well for reconsideration. In the case of private as well as public restraints, almost all of the evidence adduced

by the Commission relates to total bans on the advertising of ophthalmic goods and services and of eye examinations—the Commission has had to rely on speculation as to what will occur after such bans have been forbidden as a matter of constitutional law.

For instance, even as early as April 9, 1976, (over a month before the May 24, 1976, decision in *Virginia Pharmacy*), the American Medical Association had changed its statements relating to advertising, a change to which the Commission seems not to refer. It will be recalled [10] that the Staff Report stated that the Opinions of the Judicial Council of the AMA "make clear that advertising is considered a form of solicitation," and that it quoted one of those Opinions to the effect that "[t]he refraining from or the employment of advertising is the clearly defined difference between a reputable physician and a quack . . .." Staff Report at 70. 235 J.A.M.A. 2328 (1976), *quoted in* Brief for Petitioner A.M.A., App. A. The April 9, 1976, Statement of the Judicial Council purports to "reaffirm[ ] the long-standing policy of the Judicial Council on advertising and solicitation by physicians." However, the Statement says that "[t]he *Principles [of Medical Ethics]* do not proscribe advertising; they proscribe the solicitation of patients." *Id.* The Statement defines advertising as "the act of making information or intention known to the public." *Id.* Solicitation means

> The attempt to obtain patients by persuasion or influence, using statements or claims that (1) contain testimonials, (2) are intended or likely to create inflated or unjustified expectations of favorable results, (3) are self-laudatory and imply that the physician has skills superior to other physicians engaged in his field or specialty of practice, or (4) contain incorrect or incomplete facts, or representations or implications that are likely to cause the average person to misunderstand or be deceived.

10. *See* text at 36–37 of 200 U.S.App.D.C., at 900–901 of 626 F.2d, *supra.*

*Id.* The Statement's discussion of permissible advertising practices is reproduced below:

> The public is entitled to know the names of physicians, the location of their offices, their office hours, and other useful information that will enable people to make a more informed choice of physician.
>
> The physician may furnish this information through the accepted local media of advertising or communication, which are open to all physicians on like conditions. Office signs, professional cards, dignified announcements, telephone directory listings, and reputable directories are examples of acceptable media for making information available to the public.
>
> A physician may give biographical and other relevant data for listing in a reputable directory. A directory is not reputable if its contents are false, misleading, or deceptive or if it is promoted through fraud or misrepresentation. If the physician, at his option, chooses to supply fee information, the published data may include his charge for a standard office visit or his fee or range of fees for specific types of services, provided disclosure is made of the variable and other pertinent factors affecting the amount of the fee specified. The published data may in-

clude other relevant facts about the physician, but false, misleading, or deceptive statements or claims should be avoided. *Id.*[11]

We note also that the Commission ruled on October 12, 1979, that the American Medical Association must let doctors advertise their fees and solicit and compete for patients. *In the Matter of the American Medical Association,* Final Order (Docket No. 9064).[12] In that ruling, the Commission was willing to allow the AMA to set and enforce "reasonable ethical guidelines" to prevent "false or deceptive" advertising and to regulate "uninvited, in-person solicitation of . . . patients, who, because of their particular circumstances, are vulnerable to undue influence." *Id.* at 2.

We cannot, of course, now say how extensive a difference the new statement or the new ruling will work in practice. But that is precisely the point—changes are under way whose course neither we nor the Commission can predict, but which may well affect the necessity for the rule.

## IV

*Section 456.7*

There is one section of the rule which we have not yet discussed and as to which we

---

**11.** The Statement says that "[f]reedom of choice of physician and free competition among physicians are prerequisites of optimal medical care." However, the emphasis of the Statement's section on competition is best reflected by its admonition that "[s]ome competitive practices accepted in ordinary commercial and industrial enterprises—where profit-making is the primary objective—are inappropriate among physicians." Specifically, for instance, physicians "should not make extravagant claims or proclaim extraordinary skills."

The Statement also reminds its readers that local, state, and specialty medical associations may have restrictions on advertising that "exceed" the *Principles of Medical Ethics,* and that at least thirty-four states restrict by statute advertising or solicitation.

**12.** Specifically, the AMA is ordered to cease and desist from:

A. Restricting, regulating, impeding, declaring unethical, interfering with, or advising against the advertising or publishing by any person of the prices, terms or conditions

of sale of physicians' services, or of information about physicians' services, facilities or equipment which are offered for sale or made available by physicians or by any organization with which physicians are affiliated;

B. Restricting, regulating, impeding, declaring unethical, interfering with, or advising against the solicitation, through advertising or by any other means, including but not limited to bidding practices, of patients, patronage, or contracts to supply physicians' services, by any physician or by any organization with which physicians are affiliated; and

C. Inducing, urging, encouraging, or assisting any physician, or any medical association, group of physicians, hospital, insurance carrier or any other non-governmental organization to take any of the actions prohibited by this Part.

In the Matter of the American Medical Association, Final Order at 2 (Docket No. 9064, Oct. 12, 1979).

can presently make a decision, since it will remain unaffected by any changes in state statutes following the Supreme Court's decision in *Bates.* That is section 456.7, the text of which follows:

In connection with the performance of eye examinations, it is an unfair act or practice for a refractionist to:

(a) Fail to give to the buyer a copy of the buyer's prescription immediately after the eye examination is completed. *Provided*: A refractionist may refuse to give the buyer a copy of the buyer's prescription until the buyer has paid for the eye examination but only if that refractionist would have required immediate payment from that buyer had the examination revealed that no ophthalmic goods were required;

(b) Condition the availability of an eye examination to any person on a requirement that that person agree to purchase ophthalmic goods from the refractionist;

(c) Charge the buyer any fee in addition to the refractionist's examination fee as a condition to releasing the prescription to the buyer. *Provided*: A refractionist may charge an additional fee for verifying ophthalmic goods dispensed by another seller when the additional fee is imposed at the time the verification is performed; or

(d) Place on the prescription, or require the buyer to sign, or deliver to the buyer a form or notice waiving or disclaiming the liability or responsibility of the refractionist for the accuracy of the eye examination or the accuracy of the ophthalmic goods or services dispensed by another seller.

As to this section, we cannot say the Commission erred.

■ The American Optometric Association objects that, insofar as subsections (a) and (b) apply to prescriptions for contact lenses, they are arbitrary and capricious and not supported by substantial evidence. However, the record contains extensive testimony that refractionists have frequently placed the restrictions described in the rule on the provision of prescriptions, *see, e. g.,* Staff Report at 241–59, and that that practice has harmed consumers by (1) making comparison shopping difficult or impossible, *see, e. g.,* Staff Report at 260–62, (2) removing any incentive for dispensers of ophthalmic goods and services to advertise, *see, e. g.,* Staff Report at 262–63, and by (3) reducing the ability of opticians to compete, *see, e. g.,* Staff Report at 264.

The AOA contends that the decision to adopt these sections of the rule was made heedless of any threat to the health of consumers posed by the inability of opticians adequately to fit contact lenses. However, there was specific expert testimony that opticians are qualified to dispense contact lenses, *see* Staff Report at 278–80, and, in any event, we have no reason to dismiss the Staff Report's conclusion that state laws regulating opticians sufficiently safeguard the consumer's welfare. Finally, we note that the American Medical Association does not contest this section of the rule and that, "[o]n the contrary, the AMA has long taken the position that a patient is entitled to a copy of his or her prescription and to have that prescription filled wherever he or she chooses." Brief at 4.[13]

---

**13.** The AOA also argues that these parts of the rule "unconstitutionally infringe upon the complex doctor-patient relationship in an area where significant health factors are involved, cf. *Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973), as well as on the doctor's right to practice his profession without arbitrary governmental interference. Cf. *Doe v. Bolton,* 410 U.S. 179, 197–98, 199, 93 S.Ct. 739, 750, 751, 35 L.Ed.2d 210 (1973); *N.A. A.C.P. v. Button,* 371 U.S. 415, 439, 83 S.Ct. 328, 341, 9 L.Ed.2d 405 (1963); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238 n.5, 77 S.Ct. 752, 756 n.5, 1 L.Ed.2d 796 (1957)." Brief at 64.

As to the first part of that argument, *Roe v. Wade* involved the special circumstances of a woman's fundamental right to decide without undue governmental interference whether to have an abortion, and the AOA does not contend that a fundamental right to make such a decision free of governmental supervision is present here. In any event, where a rule is written to protect the patient against the doctor's abuse of the "complex doctor-patient relationship," the doctor is hardly in a position to

The American Medical Association argues that § 456.7(d)—which forbids an ophthalmologist to include with a prescription a disclaimer of liability for the adequacy of goods and services another person dispenses—is without support in the record. However, the record contains considerable evidence that such disclaimers have been used to discourage comparison shopping, to mislead consumers as to the locus of liability for unsatisfactory ophthalmic goods and services, and to frighten consumers into purchasing ophthalmic goods and services from the refractionist. *See* Staff Report at 248–51, 277. An example, perhaps extreme but nevertheless illuminating, of a statement which could plainly have those effects is set out below:

> It is the policy in our office to provide the highest quality visual care available. We strongly believe that the best needs of the patient are met when all services are rendered under the direct supervision of the prescribing doctor, only he has the full knowledge of your visual needs. Should difficulty arise with any prescription filled in our office, we feel a responsibility to our patients to re-examine and charge the prescription at no additional charge. It should be understood that by taking the prescription to another party

for fabrication the patient is removing himself from the care and responsibility of the prescribing doctor. Should any difficulty arise (blurred vision, double vision, eye discomfort, headache, nausea, etc.) all expenses for professional services to re-evaluate, change lenses or frames, etc. must be considered the responsibility of the patient and/or the party filling the prescription.

I UNDERSTAND THE FULL IMPLICATIONS OF THIS RELEASE AND ACCEPT THESE RESPONSIBILITIES AS STATED.

_____  _____
Patient's Signature      Optician's Signature

Staff Report at 248–49 n.45. Given this evidence of abuse, we cannot say that section 456.7(d) is arbitrary or capricious.[14]

## V

*Conclusion*

In Part III–C of this opinion, we said that the changes wrought by the Supreme Court's decision in *Bates v. State Bar of Arizona* cast doubt on whether the Commission (1) marshalled evidence adequate to support its rule and (2) has, or properly exercised, the power to preempt state law.

---

claim exemption from regulation on the basis of that relationship.

As to the second part of the argument, the AOA itself speaks only of a right to practice a profession without *arbitrary* governmental interference. Our holding, however, is precisely that this section of the rule is *not* arbitrary.

**14.** The AMA also claims, in a footnote, that the section violates physicians' First Amendment rights. Brief at 31 n.*. The AMA asks us to "[s]ee *Bates* . . . [433 U.S.] at 364, 384, [97 S.Ct. at 2699, 2709]; *Bigelow v. Virginia*, 421 U S. 809, 824–825 [95 S.Ct. 2222, 2234, 44 L.Ed.2d 600] (1975)." We have not deduced how those pages might lead us to believe that this section violates physicians' First Amendment rights. Page 364 of 433 U.S., page 2699 of 97 S.Ct. *Bates* might be thought to be cited for the unexceptionable proposition that "[e]ven though the speaker's interest is largely economic, the Court has protected such speech in certain contexts." Page 384, 97 S.Ct. page 2709, is devoted primarily to demonstrating that restraints *may* be placed upon the advertising of lawyers. The paragraph common to the two cited pages of the *Bigelow* opinion

stands for the proposition that a state's police powers do not justify it in preventing citizens of another state from advertising an activity that is legal in that state. If the AMA has a legitimate First Amendment argument, the AMA has not sufficiently articulated it for us to rule upon it.

In any event, a common theme of the Court's commercial speech cases has been that those cases protect only truthful speech and do not prevent the state from regulating misleading speech. *See, e. g., Bates*, 433 U.S. at 383, 97 S.Ct. at 2709: "Advertising that is false, deceptive, or misleading of course is subject to restraint." We have found adequate evidence in the record to support the Commission's conclusion that these waivers are misleading. Further, the Commission has taken into account First Amendment problems by stating that "affirmative statements concerning responsibility are permissible" and that therefore a refractionist might use such a statement as the following: "The person who dispenses your eyeglasses is responsible for their accuracy." 43 Fed.Reg. 46296 (Oct. 6, 1978).

In light of those changes, of course, the Commission may wish to revise its rule, as our remand gives it the opportunity to do. Therefore, it would be gratuitous for us to intimate any view as to the proper resolution of those questions, and we emphasize that we reserve judgment on them. However, we suspend the operation of the rule (except, of course, for section 456.7) until such time as the Commission has completed its reconsideration.

*It is so ordered.*